Ingraham, J.
Twenty-fifth street, between Broadway and Sixth avenue, in the city of New York, was opened in pursuance of the provisions of the act of 1813, and the land condemned by the city and paid for in pursuance of the provisions of that act.
The provisions have, since their passage, been the subject of much judicial discussion, but I think it will be proper to call attention to the language used by the act, in relation to the interest that vests in the city of New York in the land condemned and taken thereunder. After providing for the appointment of commissioners and the confirmation of their report by the supreme court, the statute provides: “And on such final confirmation of such report by the said court, the said mayor, aldermen and commonalty of the city of New York, shall become and be seized in fee of all the said lands, tenements, hereditaments and premises in the said report mentioned, that shall or may be so required for the purpose of opening the said public square or place, street or avenue, or part or section of a street or avenue so to be opened .... as the case may be, the same to be appropriated, converted and used to and for said purpose accordingly,” and thereupon said mayor, &c., may take possession of the same ; and then follows the proviso, “ In trust, nevertheless, that the same be appropriated and kept open for or as part of a public street, avenue, square or place forever, in like manner as the other public streets, avenues, squares and places, in the said city are and of right ought to be.”
The fee of the land taken under the provisions of this act vests in the municipal corporation, the mayor, &c. of New York, not absolutely, but in trust for a public purpose—viz. : that the lands may be appropriated and used forever as public streets. The municipal corporation, exercising. within its sphere a portion of the sovereignty of the *466 state, hold the property, not for its profit or emolument, but for the public use as a street, and has neither the right nor the power to apply any such property to purposes inconsistent with street uses.
This principle was established in the case of People v. Kerr (27 N. Y. 198), and as far as I have been able to discover has never been questioned, but has been reaffirmed by the court of appeals in Kellinger v. Forty-second street R. R. Co. (50 N. Y. 210), and again distinctly reaffirmed in Mahady v. Bushwick R. R. Co. (91 Id. 148), where the court says: “The plaintiff, though an abutting owner simply, the fee of the street being in the city, was entitled to the use of the street, and neither the legislature nor the city could devote it to purposes inconsistent with street uses.”
But the limitation of the ownership of the city in the streets, applies only to acts which are not “included within the objects of the grant—viz.: that the land may be appropriated and used forever as public streets—as said in People v. Kerr ; or “ inconsistent with street uses,” as said in Mahady v. Bushwick Railroad Co. The court of appeals in the last case says that the Story case left untouched the decision in People v. Kerr, that a horse railroad was a street use consistent with the rights of abutting owners.
Defendant is, therefore, entitled to judgment, if it appears that the acts of the defendants were authorized by the proper authorities, and that the use complained of is a street use within the objects of the grant to the city.
Prior to the year 1813 the common council of the city provided regulations for lighting the streets of the city under the general authority to pass ordinances given by the old charters ; and by the 206th and 207th sections of the general act of 1813 penalties are provided for breaking or interfering with any glass lamp already hung or fixed or hereafter- to be hung or fixed in any of the streets of New-York.
, It thus appears that prior to the passage of the general act of 1813, the city of New York had under its general *467 power used the streets for the purpose of providing light, and that at that time, portions of the street were appropriated for such purpose. The trust on which the city held the streets was that they were to be appropriated for the purpose that the streets of said city were at that time used, viz.: among others, for lighting the streets; and an examination of the ordinances of the common council, and the statutes of the state, will show that from that time to the present, the city of New York has continually used and occupied such portion of the streets as were necessary to properly light them.
That the city has a duty to perform in lighting the streets has been decided. In Harlem Gas Light Co. v. Mayor, &c. of New York (33 N. Y. 327), Judge Brown, in delivering one of the opinions of the court, says: “The power and duty of the municipal government to furnish light for the streets and'avenues of the city is not disputed or put in controversy in this action. Indeed, it could not be with any show of reason or good sense.” Such power existing in the corporation, the legislature directed how it should be exercised.
Section 73 of chapter 335 of Laws of 1873 provides that the commissioner of public works, in conjunction with the mayor and comptroller, is authorized from time to time to contract as provided in section 97 of the act for lighting the streets with gas, and by chapter 478 of the Laws of 1879, amending section 1 of chapter 125 of Laws of 1878, it was provided that the board authorized to make contracts for lighting the streets, etc., with gas, is authorized and empowered to contract for such lighting the public lamps in said streets, etc., with gas or ot-her illuminating materials in said city, by one or more contracts.
The board mentioned and empowered by said statute, on May 25, 1881, made a contract with the defendants to light a portion of the streets of the city and Madison and Union squares by electric lights. Such contract provided that before the defendants should have the right to connect the lamps with the pipes or conductors, that the defend *468 ants should have or procure a grant or franchise from the mayor, aldermen and commonalty, authorizing the laying the gas mains or conductors in the streets or parts of streets in which the lamps are .located.
On May 3, 1881, an ordinance or resolution was adopted by the mayor, aldermen and commonalty of the city of New York, whereby the defendant was authorized and empowered to lay, erect and construct suitable wires or other conductors, with the necessary poles, pipes or other fixtures in, on, over and under the streets, avenues, etc., of the city of New York, for conducting and distributing electricity, to be done under and according to the direction of the commissioner of public works.
Thereafter the commissioner of public works granted permission to the defendants to place poles of extra size and length in Twenty-fifth street, between Broadway and Sixth avenue. And in pursuance of this authority and permission, and to carry out their said contracts with the city authorities, and under the direction of the commissioner of public works, the defendants erected the poles complained of in Twenty-fifth street, and have since that time used the said poles to carry wires as conductors from their building where the electricity is generated to the streets to be lighted, for the electric lights erected and maintained by them under the said contract, which said contract has from time to time been continued, and the defendants are at present using the said poles to carry such wire to light, said streets.
If the city authorities had erected the poles for the purpose of supplying the streets with light, it is evident that plaintiffs could not complain. Such a use of the streets would have been within the express words and conditions of the grant, and just such a use as that for which the city held the streets, viz., for the purpose of a public street. The fact, that when the act was passed, the lamps were oil lamps placed on poles, and no poles were needed to carry the conductors to such lamps, would not prevent the city, when an improved method of lighting the streets had been dis *469 covered, from using such improved method. That such power was possessed by the city, all the cases in the subject recognize.
In People v. Kerr (supra), the court says, on page 203: “ The principle that in the dedication to the uses of a city street, is involved the right to apply the land to all the public and beneficial uses for which such streets shall from time to time be adapted, is one which is in accordance with the nature and character of the common lawand on page 204: “I see no reason to doubt that the acquisition of the fee for the purposes of a street by the corporation of New York, subjects whatever ultimate estate or right of reversion that may remain in the original owners, to a servitude commensurate with all the uses and purposes of a street in a great city.” In Story v. Elevated R. R. (90 N. Y. 161), Danforth, J. : “The public purpose of a street requires of the land the surface only. Very ancient usage permits the introduction under it of sewer and water pipes •and upon it posts for lamps ; of these things an abutting owner could not complain.” And Tract, J., says at page 179 : “As the other streets of the city were or lawfully ought to be, so this street was to be ; it was to be an open street; one which would furnish light and air to the abutting property, and a free and unobstructed passage to the inhabitants of the city. While the legislature may regulate the use of the street as a street, it has no power to authorize a structure thereon, which is subversive of and repugnant to the uses of the street as an open public street. Whether a particular structure authorized by the legislature is consistent or inconsistent with the use, of the street as a street, must be largely a question of fact depending upon the nature and character of the structure authorized.”
It cannot be seriously maintained that the structure here erected closes the streets to any appreciable extent, nor that such poles seriously affect the light or air of or the right of access to plaintiff’s property ; but such use of the streets is entirely consistent with the use of the street as a street, and is not such a structure as is “subversive of and *470 repugnant to the uses of the street as an open public street.”
The legislature has, as we have seen, given the city authorities power and authority to light the streets, and, instead of doing it directly by the city, it has authorized and empowered them- to contract for such lighting the public lamps with gas or other illuminating materials in said city by one or more contracts.
This power given was conferred for public purposes, and while they are to be exercised in conformity with the direction of the legislature, yet within the discretion given by the legislature as to the mode and manner of lighting the streets and the illuminating materials to be used for such purpose, the city authorities are the “ sole and exclusive judges” (Matter of Dugro, 50 N. Y. 517; Hines v. City of Lockport, 50 N. Y. 238).
The rule is well settled that where power is conferred on public officers or a municipal corporation to make improvements and to keep them in repair, the duty to make them is quasi judicial or discretionary, involving a determination as to the necessity, requisite capacity, location, etc., and for a failure to exercise this power, or an erroneous estimate of the public needs, no civil action can be maintained (Urquhart v. City of Ogdensburg, 91 N. Y. 71). And the fact that this power be placed in the hands of one or more officers is only another form for the execution thereof (Matter of Zborowski, 68 N. Y. 90).
In the exercise of such power the proper authorities have made a contract with the defendants to light certain of the streets, and the common council have authorized defendants to erect the necessary poles, pipes or other fixtures for conducting or distributing electricity under the direction of the commissioner of public works.
The commissioner had given permission to erect the poles objected to, and it thus appearing that the city authorities following the direction of the legislature, have exercised the discretion vested in them, their action became conclusive—for if a person owning property on a street could ob *471 ject and prevent the carrying out of the contract, it would give such property owner the power which the legislature has vested in the city authorities.
The fact that the street through which the poles are located is not one of the streets lighted is, not material.
The manner of lighting the streets is the discretion that is vested in the city authorities, and they having exercised such discretion, by providing that certain streets are to be lighted by wires carried through Twenty-fifth street, their acts cannot be reviewed. Such a provision was, from the nature of the material used, absolutely necessary. It. is impossible to generate electricty at the foot of each lamp post, and under such circumstances, in order to carry out the power given to light the streets, it was necessary to bring the electricity to the streets to be lighted.
The same remark applies to the claim of the plaintiff that the city authorities, or their contractor, should have placed the wires under ground. There was much evidence taken on that subject, and I do not think that such evidence established the fact that any underground conductor has been invented, the use of which would enable the defendant to perform its contract; but it is sufficient- to say that, the city authorities have authorized the use of overground- conductors for such purpose.
The same may be said in answer to the proposition that, as another company using a different system have successfully used underground conductors, that defendant should also use such, underground conductors—the city authorities in the exercise of the discretion vested in them, have not employed such system, but have employed the defendant’s system.
The examination that I have been able to give to this case has convinced me that the city authorities have the power to light the streets by contracting with the defendants, and, having exercised such power, they are the sole and exclusive judges of the means to be employed, so long as they do not authorize a use which “is subversive of and repugnant to the use of the street as an open, public *472 street,” and the poles used by the defendants are not such a use. This view is substantially the same as was arrived at by Judge Haight, in People ex rel. McManus v. Thompson, decided in September, 1883.
The fact that obstructions which have from time to time been authorized in the streets, are gradually becoming so serious as to do great injustice -to the owners of property fronting on the streets used, must be apparent to all, but such considerations are properly addressed to the legislature ; the courts have to apply the law as they find it, and not attempt to correct abuses, the correction of which belongs to the legislative department of the government.
In consequence of the view that I have taken of this case I have not considered it necessary to determine the authority of the defendants under the resolution of the common council, and chapter 512 of the Laws of 1879, as amended by chapter 73 of the Laws of 1882, to use the streets for the purpose of supplying electricity to private persons.
It might well be doubted whether such a use was one included within the objects of the grant to the city, and whether the legislature or the corporation would be authorized to grant to private parties for private purposes the right to obstruct or use the streets which are held by the city in trust that the same be appropriated a public street forever ; but the determination of that question is not necessary to the decision of this case.
I am of the opinion, therefore, that defendant is entitled to judgment, with costs.